1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Peter A. Schey, Cal. Bar No. 58232
Carlos R. Holguin, Cal. Bar No. 90754
Cynthia Lucas, Cal. Bar No. 247335
256 S. Occidental Blvd.
Los Angeles, Ca. 90057
Telephone: (213) 388-8693 exts. 104, 109, 116
Facsimile: (213) 386-9484

ASIAN PACIFIC ISLANDER LEGAL OUTREACH
Victor M. Hwang, Cal. Bar No. 162467
Ivy C. Lee, Cal. Bar No. 202375
1188 Franklin Street, Suite 202
San Francisco, CA 94109
Telephone: (415) 567-6255 exts. 24, 34
Facsimile: (415) 567-6248

*Attorneys for Plaintiffs* (additional counsel listed next page)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| CATHOLIC CHARITIES CYO (SAN FRANCISCO), *et al.*, | ) ) ) | Case No. C 07-01307-PJH |
| Plaintiffs, | ) ) ) | OPPOSITION TO MOTION TO DISMISS. |
| v. | ) ) ) | |
| MICHAEL CHERTOFF, Secretary, U.S. Department of Homeland Security; *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | Hearing: August 8, 2007 Time: 9:00 a.m. Courtroom 3, 17th Floor |

*Plaintiffs' counsel, continued*

SANCTUARY FOR FAMILIES
Julie E. Dinnerstein, N.Y. Bar No. 2779510
Sanctuary for Families
Brooklyn Family Justice Center
350 Jay Street, 15th Floor
Brooklyn, NY 11201
Telephone: (718) 250-5103
Facsimile: (718) 624-4240

CENTRAL AMERICAN RESOURCE CENTER
Daniel Sharp, Cal. Bar No. 237473
2845 West 7th Street
Los Angeles, CA 90005
Telephone: (213) 385-7800
Facsimile: (213) 385-1094

PUBLIC LAW CENTER
Kenneth W. Babcock, Cal. Bar No. 100183
Kirsten M. Kreymann, Cal. Bar No. 236630
601 Civic Center Drive West
Santa Ana, CA 92701
Telephone: (714) 541-1010
Fax: (714) 541-5157

James Parry Eyster, Mich. Bar No. P37894
3475 Plymouth Road
Ann Arbor, MI 48105
Telephone: (734) 827-7929
Facsimile: (734) 827-7925

BUSTAMANTE AND ASSOCIATES, PLC
Andrés Bustamante, Cal. Bar No. 147025
634 S. Spring St., Suite 910
Los Angeles, CA 90014
Telephone: (213) 891-9009
Facsimile: (213) 627-1655

///

1

2

O<small>UTLINE OF</small> C<small>ONTENTS</small>

3

I   Introduction ................................................................................................. 1

4

II  Plaintiffs have a personal stake in the outcome of this action and accordingly satisfy
    Article III standing requirements. ................................................................ 2

5

    A    The individual plaintiffs have standing. ............................................ 3

6

    B    The organizational plaintiffs have standing to sue on behalf of their clients as well
         as for injury to their own interests. .............................................. 12

7

8

III The Immigration and Nationality Act and VAWA Reauthorization Act create private
    rights of action for defendants' failure to implement the U visa program. ......... 14

9

IV  Plaintiffs have stated a viable claim for relief challenging defendants' failure to
    promulgate regulations implementing the U visa program. .......................... 18

10

    A    This Court has jurisdiction to enjoin defendants' failure to promulgate U visa
         regulations. ......................................................................... 18

11

12

    B    Defendants' refusal to promulgate U visa regulations is final action within the
         meaning of the Administrative Procedure Act. ............................... 23

13

    C    Regardless of whether or not they promulgate U visa regulations, defendants may
         not lawfully refuse crime victims the full measure of the immigration-related
         rights and benefits Congress has conferred on them. ........................ 24

14

15

16

V   Defendants' unilaterally reducing the rights of deferred action applicants to employment
    authorization violate the APA's notice and comment requirements ................. 25

17

18

VI  Denying the parents of U.S. citizen crime victims the immigration benefits enjoyed by
    the parents of alien crime victims is neither rational nor substantially related to an
    important governmental interest. ................................................................ 28

19

20

    A    The challenged classification scheme burdens innocent children's right to family
         integrity, and must therefore be substantially related to an important
         governmental interest. ........................................................... 28

21

22

    B    The challenged classification is also devoid of a rational basis. ............ 32

23

VII Plaintiffs have a cognizable due process interest in applying for and receiving an
    adjudication of their eligibility for U visas. ................................................ 33

24

25

VIII   Conclusion ................................................................................................ 34

26

27

28

1

2

3

TABLE OF AUTHORITIES

4

<u>Cases</u>

5

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach, M.D.*, 469 F.3d 129 (D.C. Cir. 2006) ................................................................................................................ 13

6

*Abrams v. Hills*, 547 F.2d 1062 (9th Cir. 1976), *cert. dismissed*, 439 U.S. 1001 (1978) .................. 20

7

*American Fed. Gov't Employees v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ..................................... 26

8

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) .......................................................................... 10

9

*Atchison v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) ................................................................... 27

10

*Basel v. Knebel*, 551 F.2d 395 (D.C. Cir.1977) ............................................................................... 11

11

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) .................................................................... 26

12

*Baxtrom v. Herold*, 383 U.S. 107 (1965) ........................................................................................ 28

13

*Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166 (9th Cir. 2002) .................................... 21

14

*Brock v. Pierce County*, 476 U.S. 253 (1986) ................................................................................. 19

15

*Brock v. Pierce County*, 476 U.S. 254 (1986) ................................................................................. 22

16

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................................................... 29

17

*Butros v. INS*, 990 F.2d 1142 (9th Cir. 1993) ................................................................................. 33

18

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ................................................. 32

19

*Clark v. Jeter*, 486 U.S. 456 (1988) ............................................................................................... 29

20

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ......................................................................... 23

21

*DeBrown v. Trainor*, 598 F.2d 1069 (7th Cir. 1979) ...................................................................... 11

22

*Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584 (D.C. Cir. 1971) ......................... 24

23

*Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380 (1974) .................................................. 17

24

*Fortyune v. American Multi-Cinema Inc.*, 364 F.3d 1075 (9th Cir. 2004) ...................................... 10

25

*Fraga v. Smith*, 607 F. Supp. 517, 521 (D. Or. 1985) .................................................................... 20

26

27

28

*Francis v. INS*, 532 F.2d 268 (2d Cir. 1976) .................................................................. 32

*Garberding v. INS,* 30 F.3d 1187, 1190-91 (9th Cir. 1994) .......................................... 32

*Gottlieb v. Pena*, 41 F. 3d 730, 733-34 (D.C. Cir. 1994) ............................................ 23

*Gottlieb v. Pena*, 41 F.3d 730 (D.C. Cir. 1974) ........................................................ 22

*Griffeth v. Detrich*, 603 F.2d 118, 120-122 (9th Cir. 1979) (due process right to apply for general relief).........................................................................................................14, 20, 33

*Griswold v. Connecticut*, 381 U.S. 479, 496 (1965) ................................................... 29

*Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562 (11th Cir. 1989), *aff'd sub. nom. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991)..............................................14, 20, 33

*Hsieh v. Kiley*, 569 F.2d 1179, 1182 (2d Cir.), *cert. denied*, 439 U.S. 828 (1978)........................... 20

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977).................................. 12

*Immigrant Assistance Project of the L.A. County Fed'n of Labor*, 306 F.3d 842, 867 (9th Cir. 2001) 13

*INS v. Legalization Assistance Project of the L.A. County Fed'n*, 510 U.S. 1301 (1993)................... 13

*Jimenez v. Weinberger*, 417 U.S. 628 (1974) ............................................................. 32

*Liesang v. Secretary of Veterans Affairs*, 312 F.3d 1368, 1377 (D.C. Cir. 2002) ............................ 23

*Lusardi v. Xerox Corp.*, 975 F.2d 964, 975 (3d Cir. 1992)............................................... 11

*Mallette v. County Employees' Retirement System II*, 91 F.3d 630, 638-39 (4th Cir. 1996) ........ 20, 33

*Mathews v. Lucas*, 427 U.S. 495, 510 (1976) ............................................................ 32

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264 (1991)............................................................................................................. 3

*Myers v. United States*, 272 U.S. 52, (1926)............................................................. 17

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974)................................. 19

*Nyquist v. Mauclet*, 432 U.S. 1, 10 (1977)............................................................... 17

*Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831 (9th Cir. 2000) .......... 17

*Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 836 (9th Cir. 2000).... 15

*Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003)......................................... 12

*Or. Advocacy Ctr. V. Mink*, 322 F.3d 1101, 1118 (9th Cir. 2003)......................................... 10

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 553 (9th Cir. 1990) ................................14, 20, 33

*Oregon Advocacy Cntr v. Mink*, 322 F.3d 1101 (9th Cir. 2003)........................................ 10

*Paunescu v. INS*, 76 F. Supp.2d 896, 901 (N.D. Ill. 1999)............................................ 20

*Plyler v. Doe*, 457 U.S. 202, 216-217 (1982) ........................................................ 29

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 646 (9th Cir. 1981)... 27

*Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983) ........................................ 26

*Price v. City of Stockton*, 390 F.3d 1105, 1111 (9th Cir. 2005)........................................ 18

*Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)................................................... 29

Pub. L. 109-162, 119 Stat. 2960 (2006)................................................................ 18

*Reed v. Heckler*, 756 F.2d 779, 786 (10 Cir. 1985).................................................... 11

*Reno v. Catholic Social Servs.*, 509 U.S. 43 (1993).................................................. 14

*Rockbridge v. Lincoln*, 449 F.2d 567, 571 (9th Cir. 1971)............................................ 16, 20

Rule 12(b), Fed. R.Civ.Proc............................................................................ 27

*San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 885 (9th Cir. 2002) ............................ 22

*SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)...................................................... 19

*Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987)........................................... 23

*Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1104-06 (9th Cir. 2004) ...................... 13

Sosna v. Iowa, 419 U.S. 393 (1975),................................................................... 11

*Stanton v. Stanton*, 421 U.S. 7, 14 (1975)............................................................ 28

*Suter v. Artist M.*, 503 U.S. 347 (1992) ............................................................. 17

*Tapia-Acuna v. INS*, 640 F.2d 223, 224-25 (9th Cir. 1981) ........................................... 33

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).............. 21

*Tigner v. State of Texas*, 310 U.S. 141, 147(1939) .................................................. 28

*Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979) ............................ 14

*U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528 (1973) .......................................... 32

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-57 (1996) ........................................................................................................................... 12

*United States v. Markgraf*, 736 F.2d 1179, 1183 (7th Cir. 1983) ......................................... 17

*United States v. Montalvo-Murillo*, 495 U.S. 711, 713 (1990) ............................................. 23

Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, Div. A, 114 Stat. 1464 (2000) .................................................................................................................... 1

*Warth v. Seldin*, 422 U.S. 490, 511 (1975) ......................................................................... 11

*Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175 (1972) ....................................... 29

*White v. Mathews*, 559 F.2d 852, 857 (2d Cir. 1977)........................................................... 11

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952).................................... 17

*Yu v. Brown*, 36 F. Supp.2d 922, 931 (D.N.M. 1999) .......................................................... 20

*Zaharakis v. Heckler*, 744 F.2d 711 (9th Cir. 1984) ........................................................... 24

*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1051 (5th Cir. 1981) .......................... 11

Other authorities

5 U.S.C. § 552(a) ............................................................................................................... 26

5 U.S.C. § 552(a)(1)(D) ...................................................................................................... 26

5 U.S.C. § 555(b).............................................................................................................. 20

5 U.S.C. § 706(1)............................................................................................................... 20

5 U.S.C. § 706(2)(a) .......................................................................................................... 23

8 C.F.R. §§ 240.20 *et seq.* ................................................................................................. 31

8 U.S.C. § 1151(b)(2)(A)(i) ................................................................................................ 31

8 U.S.C. § 1184(p)(1) .......................................................................................................... 8

8 U.S.C. § 1184(p)(3)(B) ................................................................................................ 4, 25

8 U.S.C. § 1229b(b).......................................................................................................... 31

8 U.S.C. § 1427(a) ................................................................................................ 2

8 U.S.C. §§ 1101(a)(15)(U)(i)(III) ..................................................................... 28

8 U.S.C. 1229b ..................................................................................................... 31

I     INTRODUCTION

This is a class action seeking equitable relief compelling the U.S. Department of Homeland Security ("DHS") and the United States Citizenship and Immigration Services ("USCIS") to discharge their statutory duty to confer lawful status on immigrant crime victims who assist law enforcement officials in the investigation or prosecution of criminal offenders.

On October 28, 2000—nearly seven years ago—the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, Div. A, 114 Stat. 1464 (2000), *codified at*, *inter alia*, 8 U.S.C. § 1101(a)(15)(U) ("Crime Victims Act"), was signed into law. Among other things, the Crime Victims Act directed defendants to issue temporary lawful immigration status to immigrants who are victims of serious crimes and who assist law enforcement in prosecuting offenders. The "U" visa entitles the holder to live and work lawfully in the United States, to leave and reenter the country, to obtain a range of services unavailable to immigrants without lawful status, and to apply for permanent resident status after three years. The U visa reflects Congress's judgment that certain crime victims should be permitted to remain lawfully in the United States, both for humanitarian reasons and to encourage them to help bring dangerous, violent criminals to justice.

Despite having nearly seven years to do so, defendants have still not implemented the U visa program. While Congress allocated 10,000 U visas per year, not one has been issued.

Instead of complying with Congress's directive, defendants have created an "interim" program via administrative fiat under which immigrants who (1) are willing to take their chances and apply for a visa before the rules are issued, thus exposing themselves to potential arrest and deportation if they are found to be ineligible, and (2) show that they are *prima facie* eligible for U visas receive an amorphous, non-statutory status known as "deferred action." Essentially, defendants agree in their discretion to temporarily not deport persons granted deferred action and, upon separate application, may grant them work authorization and sometimes permission to travel abroad. Though defendants seek dismissal of this action on multifarious technical grounds, their basic defense is that

they will issue actual U visas when they're ready and until they do, deferred action will have to be good enough.[1]

But unlike visa-holders, whose right to travel is inherent, persons with deferred action may not travel outside the United States unless they apply for and are granted discretionary travel authorization only available in extraordinary circumstances. Similarly, persons with deferred action must apply and pay fees yearly for work authorization, whereas U visa holders would be authorized to work incident to their lawful immigration status.[2] These injuries are clearly more than enough to satisfy Article III and all statutory standing requirements.

II    PLAINTIFFS HAVE A PERSONAL STAKE IN THE OUTCOME OF THIS ACTION AND ACCORDINGLY SATISFY ARTICLE III STANDING REQUIREMENTS.

Defendants argue that "[a]ll plaintiffs in this case, eight organizational plaintiffs and nineteen individual plaintiffs … lack standing to pursue … a claim [relating to the delay in issuing application materials and rules]," because "the related statutes were not intended for the benefit of the organizations, and each individual plaintiff has either received interim relief in the form of deferred action, is presently having their application for interim relief adjudicated, and/or has received some other benefit …" Motion to Dismiss at 1 ("Mo. Dismiss"). Defendants also argue that because they have offered a small number of plaintiffs and class members a hybrid uncertain status called

_____

[1] Defendants also seek dismissal of a range of claims regarding their substantive policies applied when deciding whether to grant U visa applicants deferred action status, policies that may well be included in defendants' regulations whenever they are promulgated.

[2] Finally, even assuming, *arguendo*, the bona fides of defendants' informal pledge to count time in deferred action towards eligibility for permanent residence, plaintiffs who should have received U visas more than three years ago are presently being denied lawful permanent residence and, *a fortiori*, the right to proceed to naturalization. Lawful permanent residents are generally entitled to obtain citizenship through naturalization five years after having obtained permanent resident status. *See* 8 U.S.C. § 1427(a).

OPPOSITION TO MOTION TO DISMISS                              CENTER FOR HUMAN RIGHTS
CASE NO. C 07-01307-PJH                  - 2 -           256 S. Occidental Blvd LA 90057

"deferred action,"[3] none of the plaintiffs "are able to show a concrete injury-in-fact, and thus, they lack standing." *Id.*

As we will show, under all available authoritative precedent the organizational and individual named plaintiffs in this case have standing.

**A      The individual plaintiffs have standing.**

As the Complaint and defendants' motion to dismiss point out, all 19 individual plaintiffs have requested "deferred action" in the event defendants refuse to adjudicate their applications for U visas, and most plaintiffs have been granted temporary "deferred action." However, as much as defendants may try to conflate "deferred action" with a U visa, they are obviously not the same. The short answer to defendants' position is that had Congress only wanted to grant immigrant crime victims who cooperate with law enforcement "deferred action," there was no reason for it to take the time to draft, discuss, and enact a U visa law with its assorted benefits and protections.

Defendants believe that plaintiffs' claims are "misguided," because "[a]s recipients of … deferred action … plaintiffs enjoy the … [same] rights and entitlements that future recipients of U visa status will also enjoy." Mo. Dismiss at 9. If defendants are correct, Congress wasted its time

---

[3] "Deferred action" refers to "an exercise of administrative discretion by the USICE district director under which the defendants take no action to proceed against an apparently deportable alien. 6 C. Gordon, S. Mailman, & S. Yale-Loehr, *Immigration Law and Procedure* §§ 72.03[2][a] & [2][h] (1998). The decision to grant or withhold deferred action status lies within the discretion of the defendants and is clearly for the their "convenience and benefit," not the immigrant's. *Siverts v. Craig*, 602 F. Supp. 50 (D. Haw. 1985); *Romeiro De Silva v. Smith*, 773 F.2d 1021 (9th Cir. 1985) (same). In each such instance, the determination to grant deferred action is "confined to administrative discretion. . . ." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485 (U.S. 1999). Judicial review of "no deferred action" decisions and similar discretionary determinations, "if they are reviewable at all, … will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed [to review final orders of deportation issued by Immigration Judges]." *Id.* In short, "deferred action" status is a highly discretionary and vulnerable status, with virtually no realistic opportunity for judicial review unless the denied immigrant is placed in removal proceedings, is found deportable by an Immigration Judge, appeals that decision to the Board of Immigration Appeals, is again found deportable, and finally seeks judicial review of that decision before a Circuit Court of Appeals.

writing and enacting the new U visa category since those who would benefit from the law already "enjoy" all of the "rights and entitlements that … recipients of U visa status will … enjoy." *Id.*

Defendants first focus on the right to employment authorization and point out that they have granted employment authorization to all but two of the individual named plaintiffs. Mo. Dismiss p. 9. What defendants fail to discuss is that their challenged policy forbids "plaintiffs and those similarly situated from applying for employment authorization until after they receive deferred action status," Complaint ¶ 75,[4] and the "temporary employment authorization" defendants eventually grant "must be renewed through a new application [and fee] annually." *Id.* ¶ 6; ¶¶ 7-10, 12, 13 (same). In contrast, 8 U.S.C. § 1184(p)(3)(B) provides "the Attorney General shall, *during the period those aliens are in lawful temporary resident status* under [8 U.S.C. §§ 1101(a)(15)(U)], provide the aliens with employment authorization." *Id.* (emphasis supplied). Also, as the Complaint alleges, defendants recently amended their employment authorization policy for U visa applicants so that now applicants may only apply for such authorization *after* defendants decide to grant them deferred action status. Plaintiff Rocha Rocha for example, "was issued a denial of his application for employment authorization on or about January 17, 2007," while his "application for U visa benefits remain[ed] pending." Complaint ¶ 63.  Plaintiffs will shortly file a First Amended Complaint adding a new plaintiff who had her employment authorization rejected because she had not yet been granted deferred action status.[5]

_____

[4] On or about November 2, 2006, defendants "discontinued" their prior policy of permitting U visa applicants to apply for employment authorization at the same time as they applied for a U visa or deferred action status. Complaint ¶ 44. The new practice, which plaintiffs allege was implemented in violation of the APA, is to "reject applications for employment authorization from persons seeking U visas or deferred action based on asserted eligibility for a U visa until after deferred action is actually granted." *Id.* Defendants take "an average of several months to decide a request for deferred action based on asserted eligibility for a U visa." *Id.*

[5] Furthermore, the annual temporary employment authorization plaintiffs currently receive is linked to their "deferred action" status, and that is a status that can be terminated at will by the defendants, making the accompanying temporary employment authorization far more tenuous than the employment authorization that Congress contemplated U visa applicants would possess.

1    Defendants also equate the ability of an immigrant granted "deferred action" with the ability

2    of an immigrant granted a U visa to travel abroad. Mo. Dismiss at 10. Defendants, improperly relying

3    on an affidavit which may not be considered in a motion to dismiss (without converting the motion to

4    one for summary judgment after proper notice to all parties), admit that it is "rare that deferred action

5    recipients request authorization to travel abroad," and that if such an application is received,

6    defendants will "*on occasion*, permit [the applicant] to travel abroad …" Mo. Dismiss at 10

7    (emphasis added).

8    If plaintiffs had U visa status, they could freely travel without having to apply for each such

9    trip abroad. Instead, plaintiffs must locate, study and complete a 10-page form I-131 (Application for

10   Travel Document).[6] The fee for each application is $170, *a fee U visa holders would never incur*

11   *when traveling abroad*. The application form makes clear that Advance Parole "*is an extraordinary*

12   *measure used sparingly* … [and is issued] *due to a compelling emergency*." I-131, p. 2 (emph.

13   added). Non-immigrant visa holders, including U visa holders, may travel and return using their non-

14   immigrant visas, and their trips abroad are *not* limited to "a compelling emergency."[7]

15   Furthermore, the travel document that defendants require plaintiffs to obtain, as the I-131

16   form itself states, "is issued solely to authorize the *temporary parole* of a person [back] into the

17   United States." Form I-131, p. 2 (emphasis added). A plaintiff or class member who travels and

18

19   _____

20   6 The I-131 application for a travel document is available at --
     http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=b

21   11747a55773d010VgnVCM10000048f3d6a1RCRD

22   7 Additionally, the form includes a stern "Travel Warning," which states in part: "If you have been
     unlawfully present in the United States for more than 180 days … and you leave before removal

23   proceedings are started against you, you may be inadmissible for three years from the date of
     departure." I-131 , p. 2. The form further warns, "If you have been unlawfully present in the United

24   States for one year or more, you may be inadmissible for ten years from the date of your departure
     regardless of whether you left before, during or after removal proceedings [were commenced]." *Id.*

25   Since almost all plaintiffs and class members by definition had undocumented status before they
     applied for their U visas, they all face the consequences described in the I-131's "warning," and one

26   can certainly understand why, as defendants state, it is "rare" for a plaintiff or class member to seek
     permission to travel abroad.

27

28

comes back on Advance Parole is *not* considered to make an "entry" upon his or her return, but rather is permitted to come back on "temporary parole" status, a status which may be terminated at any time in the discretion of the defendants without the right to a due process removal hearing that the plaintiff would be entitled to without having traveled and returned on "temporary parole" status.[8]

In sum, defendants' conflating the travel rights of plaintiffs with "deferred action" status versus their travel rights if they had been granted U visas, as Congress contemplated, is ludicrous. Defendants are experts in the immigration laws and their arguments are, to be charitable, seriously misleading and dishonest.

Defendants next argue that plaintiffs suffer no harm even though without U visa status they cannot confer "derivative" status on their immediate family members, a benefit that would be available if they were granted U visas as required by Congress. Mo. Dismiss at 10, *citing* Complaint ¶ 42. Plaintiffs also raise the related claim that the denial of derivative benefits causes children of U visa applicants to "age out" of benefits when they turn 21 years of age. *Id*. The complaint identifies two derivatives, Sergio Bucio Perez and Andres Bucio Perez, who face aging out. Complaint ¶¶ 16, 48.

Defendants fail to address the situation that all plaintiffs with immediate family members face of being unable to apply for derivative status for these family members. Someone with deferred action has no right to apply for anything for their relatives, and defendants do not argue otherwise. Regarding the "age out" cases, defendants simply respond that the two "age out" plaintiffs "have [both] received interim relief of deferred action …" Mo. Dismiss at 10. Defendants nowhere deny

_____

[8] Defendants point out that "there is no indication that any of the named plaintiffs in this case ever requested authorization to travel abroad …" Mo. Dismiss at 10. Given the high cost of the application, the warnings contained in the application form that immigrants who have previously been present in the US for more than six months without authorization may be deemed "inadmissible" for three years when they try to return, and the tenuous "temporary parole" status plaintiffs would face if they return with Advance Parole, it is little wonder that plaintiffs and their class members "rare[ly]" apply for permission to travel. In any event, plaintiffs clearly wish to travel or they would not be seeking such relief through this litigation. Nothing in the law of standing requires that plaintiffs apply for a benefit through a seriously flawed program defendants devised when their real claim is that with U visas they could freely travel abroad.

1   that *whether or not* they grant deferred action status to a plaintiff or class member derivative who

2   happens to be present in the U.S., once these immigrants age out, they become statutorily ineligible

3   for derivative U visas solely because of defendants' delay in issuing such visas.

4         Next, defendants argue that plaintiffs' claim that the delay in issuing U visas prevents them

5   from "accrue[ing] time toward eligibility for lawful permanent residence" is "unsupported." Mo.

6   Dismiss at 11, *citing* Complaint ¶¶ 49-50. Defendants state that they have "provided guidance to U

7   visa adjudicators to ensure that aliens will not be harmed as a result of any delay in adjudicating U

8   visa applications." Mo. Dismiss at 11.[9] What defendants fail to mention is that plaintiffs who could

9   have received U visa status *more* than three years now face unlawful delays in obtaining permanent

10  resident status *even if defendants' "guidance" became agency policy through duly promulgated*

11  *regulations*.[10]

12        Defendants next denigrate plaintiffs' claim that with U visas, unlike with deferred action

13  status, plaintiffs are entitled "to be referred to Non-Governmental Organizations (NGOs)." Mo.

14  Dismiss at 11 *citing* Complaint at ¶ 45.  Defendants argue that plaintiffs "fail to demonstrate that they

15

16

17  [9] This "guidance" provides that U nonimmigrant status applicants "who are granted interim relief and whose applications for U nonimmigrant status are subsequently granted will have their U nonimmigrant status recorded as of the date the request for U interim relief was approved." *Id.*  Thus, recipients of deferred action who are later approved for a U visa "will be eligible to apply for adjustment of status three years from the date they received interim relief …" *Id.*

18

19

20  [10] For example, plaintiff FRANCISCA ALVAREZ is a victim of domestic violence and is statutorily eligible for the issuance of a U visa. Complaint ¶ 27. On March 19, 2002, she petitioned for benefits

21  under the Crime Victims Act. *Id.* If defendants had issued a U visas as mandated by Congress, plaintiff Alvarez would have received a U visa sometime in 2002 and become eligible for lawful

22  permanent resident status three years later, in 2005. Defendants "guidance" to grant U visas retroactive to the date on which defendants grant a U visa applicant deferred action status does

23  nothing to address plaintiff Alvarez's ongoing injury. Plaintiff SANDRA BUCIO is essentially in the same boat. She applied for a U visa in February 2004. Complaint ¶ 48. Had she been granted a U visa

24  reasonably promptly, she would by now have had U visa status for over three years and would already be eligible for or have been granted permanent resident status. Plaintiff CAMPOS applied for a

25  U visa on or about July 12, 2002, and had her U visa been issued in a reasonably timely manner she

26  could have applied for permanent resident status in 2005. Complaint ¶ 28. Defendants offering to adjudicate U visas nunc pro tunc three years does nothing to address the injury of plaintiffs and class

27  members who should have received U visas more than three years ago.

have incurred any injury because of defendants' alleged failure to provide such referrals," and that pursuant to a 2001 "guidance," USCIS affords "victims who fall into the statutory definition of victim found in the Attorney General Guidelines for Victim and Witness Assistance, all the rights contained in that directive." Mo. Dismiss at 11.[11]

Defendants next make the frivolous argument that plaintiffs suffer no harm by defendants' failure to implement § 1184(p)(3)(A) because an internal 2001 "guidance" affords "victims who fall into the statutory definition of victim found in the Attorney General Guidelines for Victim and Witness Assistance, all the rights contained in that directive." Motion to Dismiss at 11, *citing* 2001 Guidance at 5 (Ex. B). Defendants' motion to dismiss must be based upon the allegations in the Complaint. Nowhere does the Complaint state or imply that any plaintiff has ever received any benefits of any sort under the 2001 "guidance" mentioned by defendants. Indeed, defendants themselves make *no claim* that *any* plaintiff in this lawsuit had his or her injury caused by defendants' failure to implement § 1184(p)(3)(A) addressed through the offer or provision of benefits allegedly available in the 2001 Attorney General Guidelines for Victim and Witness Assistance.

Defendants next argue that plaintiffs suffer no injury even if defendants "deny deferred action to individuals who … do not furnish a [law enforcement] certification within six months [of its signature by the law enforcement agency] …" Mo. Dismiss at 11-12, *citing* Complaint at ¶ 47.[12]

---

[11] 8 U.S.C. § 1184(p)(3)(A) unquestionably requires defendants to "provide aliens [holding U visas] with referrals to nongovernmental organizations to advise the aliens regarding their options while in the United States and the resources available to them…" However, "[a]s a matter of policy and practice, defendants fail to provide persons statutorily eligible for U visas with referrals as required by 8 U.S.C. § 1184(p)(3)(A)." Complaint ¶ 45.

[12] The statute requires that a U visa application "contain a certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority investigating criminal activity" that the U visa applicant was a victim of a defined crime and cooperated with a law enforcement agency in its investigation or prosecution of the crime. 8 U.S.C. § 1184(p)(1). Logically, nothing in the statute requires or suggests that the certification must be less than six months old when filed with a U visa application, and there is nothing rational about requiring that it be less than six months old. The certified fact that a person was a victim of a crime who cooperated with a law enforcement agency in no way changes because the certification is less or more than six months old.

Defendants state that "no single plaintiff has alleged a harm incurred because of defendants' [challenged] policies regarding law enforcement attestations." *Id*. However, plaintiff MARIA TORRES alleges that she was denied a U visa and deferred action "because her U certification was not signed within six months of her request for a U visa." Complaint ¶ 31. Defendants point out that plaintiff Torres later submitted an updated U certification signed by a law enforcement agency and was then granted deferred action status. Mo. Dismiss at 12.

First, plaintiffs will shortly file a First Amended Complaint including yet another plaintiff who, like plaintiff Torres, has had her U visa application rejected because her U certification was signed by a law enforcement agency more than six months before her application was submitted to the defendants.[13]

Second, since defendants will continue to impose the challenged policy when plaintiff Torres renews her deferred action or applies for a U visa, her claim is hardly moot in any sense.

Third, as the Complaint alleges and defendants concede, it is defendants' written policy to reject U visa applications supported by a U certification signed by a law enforcement agency more than six months prior to the submission of the U visa application. Complaint ¶ 47; Mo. Dismiss at 11-

---

Defendants beg for "deference to USCIS's interpretation of its own statute …" Mo. Dismiss at 12, citing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978). However, as this Circuit stated in *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, 1178 (9th Cir. 2002), although deference will generally be given to an agency's construction of a statutory provision it is charged with administering, no deference is given to "those constructions that are contrary to clear congressional intent or that frustrate the policy Congress sought to implement." *Id*. at 1175.

[13] Plaintiffs' counsel engage in class action litigation against defendants in many cases and have gone around the block many times with defendants' repeated mootness/standing arguments to avoid judicial review, coupled with plaintiffs adding new parties until the court certifies a class and it becomes absolutely clear that dismissal of a claim may no longer be achieved even if defendants moot the claims of the class representative. Plaintiffs sought early certification in this case in part to avoid this problem of standing when there are many class members facing the same unlawful policy or practice, but the named plaintiff is repeatedly mooted out by defendants' decisions (often made in the one individual's case only because the lawsuit was filed and precisely to moot out the plaintiff's standing). Early certification avoids the briefing in the text above following this footnote and adjudication of the arguments made for and against standing.

CENTER FOR HUMAN RIGHTS
256 S. Occidental Blvd LA 90057

12. Under such circumstances, the Ninth Circuit has held that the threat of recurrent injury sufficient to preserve justiciability is *implicit*:

> In order to assert claims on behalf of a class, a named plaintiff must have personally sustained … "some direct injury as a result of the … official conduct." The harm suffered by a plaintiff must constitute "actual injury." Moreover, where, as here, a plaintiff seeks prospective injunctive relief, he must demonstrate  "that he is realistically threatened by a repetition of [the violation]." ….
> There are at least two ways in which to demonstrate that such injury is likely to recur. First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury "stems from" that policy. In other words, *where the harm alleged is directly traceable to a written policy, there is an implicit likelihood of its repetition in the immediate future*.

*Armstrong v. Davis*, 275 F.3d 849, 860-61 (9th Cir. 2001) (emphasis supplied; citations and quotations omitted); *accord Fortyune v. Am. Multi-Cinema Inc.*, 364 F.3d 1075, 1081-82 (9th Cir. 2004).[14] Defendants' six-month rule is a policy from which plaintiffs' injuries stem. Complaint at ¶ 47. The threat of future injury it presents is therefore implicit, and defendants' motion should be denied.

Finally, even assuming, *arguendo*, (i) that plaintiff Torres does not still have standing because the policy will be applied to her again when she renews her deferred action or applies for a U visa, *and* (ii) that the threat of future injury was not implicit in the defendants' policy, plaintiff Torres would still retain standing to challenge the 6-month U certification rule on behalf of the proposed class.  In *Oregon Advocacy Cntr v. Mink*, 322 F.3d 1101 (9th Cir. 2003), plaintiffs challenged a state mental hospital's failure to timely admit mentally incapacitated criminal defendants, which resulted in prolonging detention in county jails. *Id.* at 1105. The defendants argued that the plaintiffs' lacked standing because they had been admitted to a hospital before the trial began. *Id.* at 1116. The Ninth Circuit disagreed:

---

[14] *See also Or. Advocacy Ctr. V. Mink*, 322 F.3d 1101, 1118 (9th Cir. 2003) ("The continued and uncontested existence of the policy that gave rise to [plaintiffs'] legal challenge forecloses [any] mootness argument.")

> [Plaintiffs'] claims for relief continue to present a live controversy for two reasons. First, the record reflects that the detention of incapacitated criminal defendants for weeks or months … is an *ongoing, pervasive and systemic problem* … The second reason why [plaintiffs'] claims are not moot is that [they] challenge[ ] not only [defendant's] delay in admitting the seven individuals … but also *the policy that results in such delays* … [Defendant] does not dispute its policy of turning away mentally incapacitated defendants … Furthermore, [defendant] has taken *the categorical legal position* that it is not responsible for ensuring the timely admission of incapacitated criminal defendants. *The continued and uncontested existence of the policy that gave rise to [plaintiffs'] legal challenge forecloses [defendant's] mootness argument.*

*Id.* at 1117-18 (emphasis supplied). Defendants confirm that they continue to apply their 6-month U-certification policy against both plaintiff Torres and class members, and insist that the policy is lawful. Mo. Dismiss at 12. As in *Oregon Advocacy Cntr.*, *supra*, the ongoing application of the six-month policy forecloses defendants' standing argument.[15]

Lastly, defendants assert that no individual plaintiff has standing to challenge the U visa statute that operates to unconstitutionally "deny U visa eligibility to the immigrant parents of United States citizen children who are the victims of crimes and who or whose parents cooperated with law enforcement agencies in the investigation or prosecution of such crimes," while granting such derivative benefit to immigrant parents with undocumented and lawful permanent resident children. Mo. Dismiss at 12, *citing* Complaint at ¶ 83. This claim is brought by the organizational plaintiff Diocesan Migrant and Refugee Services (Complaint ¶ 13), not the individual named plaintiffs.

---

[15] Defendants' argument is further undercut by yet another line of cases. As the Supreme Court stated in *Sosna v. Iowa*, 419 U.S. 393 (1975), "[t]here may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review." *Id.* at 403 n.11. This principle has often been applied where, as here, the claims of a named class representative become moot before resolution of a motion for class certification. *See, e.g. Zeidman v. J. Ray* McDermott *& Co.*, 651 F.2d 1030, 1051 (5th Cir. 1981); *Lusardi v. Xerox Corp.*, 975 F.2d 964, 975 (3d Cir. 1992) (same); *Reed v. Heckler*, 756 F.2d 779, 786 (10 Cir. 1985) (same); *DeBrown v. Trainor*, 598 F.2d 1069, 1072 (7th Cir. 1979) (same); *White v. Mathews*, 559 F.2d 852, 857 (2d Cir. 1977) (same); *Basel v. Knebel*, 551 F.2d 395, 397 n.1 (D.C. Cir.1977) (same). *Cf. Frost v. Weinberger*, 515 F.2d 57, 63-64 (2d Cir. 1975)

**B**     **The organizational plaintiffs have standing to sue on behalf of their clients as well as for injury to their own interests.**

Nor should the Court sustain defendants' challenge to the standing of the organizational plaintiffs. Each of these organizations has members or clients who Congress clearly intended to benefit when it enacted the U visa law.[16]

In *Warth v. Seldin*, 422 U.S. 490, 511 (1975), the Supreme Court held that an organization may sue to redress its members' injuries, even without a showing of injury to the association itself:

> The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. … So long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

In *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), the Court elaborated on *Warth*, formulating a now-familiar three-prong associational standing test:

> We have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343.[17]

The organizational plaintiffs satisfy the requirements of associational standing. First, the organizational plaintiffs are legal aid groups that represent immigrant crime victims who wish to apply for U visas but have been denied such visas. *See, e.g.*, Complaint ¶¶ 6, 7, and 8. [18]

---

[16] Indeed, one provision of the U-visa law requires that defendants make referrals to non-profit organizations like the organizational plaintiffs in order to assist U-visa applicants and recipients, something defendants have ignored for seven years. 8 U.S.C. § 1184(p)(3)(A); Complaint ¶¶ 44, 77.

[17] The first and second *Hunt* requirements are constitutional; the third is prudential. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555-57 (1996).

[18] The clients of legal aid organizations are the functional equivalent of members for purposes of associational standing. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003) (advocacy organization has associational standing to sue on behalf of mentally incompetent criminal defendants

1

2

Second, there can be no question that crime victims' right to lawful administration of the U visa program is germane to the purposes of the organizational plaintiffs, which include "providing services to victims of domestic violence … [including] free legal services to low-income and under-served immigrants [and] immigrant victims of serious crimes who have cooperated with law enforcement agencies." Complaint ¶ 11.

3

4

5

6

Third, this action seeks equitable relief only. Individual participation is not normally necessary when an association seeks injunctive relief for its members. *Warth*, *supra*, 422 U.S. at 515 ("If … the association seeks a declaration, [or] injunction … it can reasonably be supposed that the remedy … will inure to the benefit of … members of the association actually injured.").

7

8

9

10

Defendants rely on Justice O'Connor's decision, sitting as a Circuit Justice, granting a stay in *INS v. Legalization Assistance Project of the L.A. County Fed'n*, 510 U.S. 1301 (1993), for the proposition that the organizational plaintiffs lack standing to sue for injuries to their own interests arising from defendants' maladministration of the U visa program. However, the Ninth Circuit later held in the same case that the organizational plaintiffs in that case had standing to sue *on behalf of their clients*:

11

12

13

14

15

16

> In *IAP IV*, Justice O'Connor held that the IRCA did not give organizational plaintiffs standing to sue on their own behalf. *See* 510 U.S. at 1305-06. Importantly, Justice O'Connor also held that the IRCA gave organizational plaintiffs representative standing to sue on behalf of their members whose claims are ripe. *See id.* at 1306. Moreover, legal aid organizations, like law firms, may have third party standing to assert the constitutional rights of their clients whose claims are ripe. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989).

17

18

19

20

*Immigrant Assistance Proj. of the L.A. County Fed'n of Labor*, 306 F.3d 842, 867 (9th Cir. 2001).[19]

21

22

23

24

25

it represents); *c.f.*, *Hunt, supra*, 432 U.S. at 342, 344 (State commission "has no members at all"; "Commission's status as a state agency, rather than a traditional voluntary membership organization, [does not] preclude[] it from asserting the claims of the Washington apple growers and dealers who form its constituency. …[I]t purpose is the protection and promotion of the Washington apple industry.... It thus serves a specialized segment of the State's economic community which is the primary beneficiary of its activities, including the prosecution of this kind of litigation.").

26

27

[19] Subsequent decisions of the Ninth Circuit have also held that organizational plaintiffs also have standing to sue in their own right when a policy impairs their ability to provide services and diverts

28

1    Defendants' motion to dismiss the organizational plaintiffs should be denied.

2  III    THE IMMIGRATION AND NATIONALITY ACT AND VAWA REAUTHORIZATION ACT CREATE
        PRIVATE RIGHTS OF ACTION FOR DEFENDANTS' FAILURE TO IMPLEMENT THE U VISA
3       PROGRAM.

4    Turning to the merits, defendants argue that neither the Immigration and Nationality Act

5  (INA) nor the VAWA Reauthorization Act create private rights of action. Mo. Dismiss at 13. Were

6  defendants correct, hundreds, if not thousands, of federal court decisions enforcing statutes that

7  confer immigration-related benefits have been improvidently decided.[20] The number of such

8  decisions is so large that there should be little need for extended discussion of defendants' theory.

9    Nevertheless, "[t]he question whether a statute creates a cause of action, either expressly or by

10  implication, is basically a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. v.*

11  *Lewis*, 444 U.S. 11, 15 (1979).

12

13

14  limited organizational resources. *E.g., Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1104-06
    (9th Cir. 2004) (organization had standing in its own right to enforce violations of the Fair Housing
15  Amendments Act); *see also Abigail Alliance for Better Access to Developmental Drugs v.
    Eschenbach, M.D.*, 469 F.3d 129, 132-33 (D.C. Cir. 2006) (finding organizational standing in due
16  process claim when the defendant's conduct frustrated the organization's purpose and forced the
    organization to divert resources).

17
18  In this case, the organizational plaintiffs allege that defendants' failure to implement the U visa
    program frustrates their missions and diverts their limited resources.  *E.g.*, Complaint at ¶ 10. In
19  essence, defendants' failure to implement the U visa program means that these organizations must
    help their clients apply for deferred action and employment authorization now, and then repeat the
20  process once U visa regulations are in place. This doubling of the services a given crime victim
    requires reduces the resources these organizations have to help other needy immigrants, including
21  other crime victims. Such injury has been held sufficient to confer standing. *See generally Or.
    Advocacy Ctr. v. Mink*, *supra*, 322 F.3d at 1112 (affirming associational standing of public interest
22  advocacy center because, *inter alia*, to the extent it devotes resources to helping aggrieved clients, the
    other needs of [other] constituents may go unmet."). The organizational plaintiffs would accordingly
23  have standing to press the instant claims in their own right.

24  [20] *E.g., Reno v. Catholic Social Servs.*, 509 U.S. 43 (1993) (entertaining private cause of action to
25  vindicate right to apply for legalization under INA); *Orantes-Hernandez v. Thornburgh*, 919 F.2d
    549, 553 (9th Cir. 1990) (entertaining private cause of action to vindicate right to apply for political
26  asylum under INA); *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562 (11th Cir. 1989), *aff'd
    sub. nom. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) (entertaining private cause of
27  action to vindicate right to apply for Special Agricultural Worker status under INA).

The Crime Victims Act's failure to explicitly set forth a right of action is hardly determinative. *First Pacific Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1124 (9th Cir. 2000) ("The absence of a statement of intent to create a remedy does not necessarily mean that no remedy is available. Indeed, if that were the case, the Supreme Court would not have developed a test for an implied private right of action."). [21] Rather, courts examine the language of the statute, the context in which the statute was passed, and its legislative history in determining whether a private right of action exists. *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 836 (9th Cir. 2000). Courts commonly apply the four-factor test prescribed in *Cort v. Ash*, 422 U.S. 66 (1975), to determine whether a private cause of action exists. *See, e.g.*, *Helfer*, *supra*, 224 F.3d at 1121-28:

> First, is the plaintiff one of a class for whose especial benefit the statute was enacted— that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally delegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78 (citations and quotation marks omitted).

It is self-evident that plaintiffs satisfy the first *Cort* factor: They clearly belong to the class for whose benefit the U visa law was enacted; indeed, they are specifically made beneficiaries of the law. [22] *See Id.*, at 1122-23 (first factor of the *Cort* test satisfied "when there is an explicit reference to the individuals for whose benefit the statute was enacted.").

---

[21] *Thompson v. Thompson,* 484 U.S. 174, 179 (1988) ("The implied cause of action doctrine would be a virtual dead letter were it limited to correcting drafting errors when Congress simply forgot to codify its evidence intention to provide a cause of action.")

[22] 8 U.S.C. § 1101(U) provides:

> (i) subject to section 214(p) [8 U.S.C. § 1184(p)], an alien who files a petition for status under this subparagraph, if the Secretary of Homeland Security determines that—

As for the second *Cort* factor, the U visa statute embodies an unmistakable, if implicit, legislative intent to create a remedy. The U visa application process must be initiated by the crime victim, a fact that evinces Congress's intent that the U visa law confer individual rights, which, *a fortiori*, are appropriately enforced via a private cause of action.

Section 1101(a)(15)(U) also establishes explicit eligibility standards. Where Congress has provided express standards to guide an agency in its exercise of discretion, courts presume that

---

(I) the alien has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity described in clause (iii);

(II) the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning criminal activity described in clause (iii);

(III) the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official, to a Federal, State, or local prosecutor, to a Federal or State judge, to the Service, or to other Federal, State, or local authorities investigating or prosecuting criminal activity described in clause (iii); and

(IV) the criminal activity described in clause (iii) violated the laws of the United States or occurred in the United States (including in Indian country and military installations) or the territories and possessions of the United States;

(ii) if accompanying, or following to join, the alien described in clause (i)—

(I) in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien; or

(II) in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien; and

(iii) the criminal activity referred to in this clause is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes; …

Congress did not intend the agency to substitute its own standards for discretion, *see Rockbridge v. Lincoln*, 449 F.2d 567, 571 (9th Cir. 1971).

The legislative history also supports an intent to create enforceable rights. As defendants in a more candid moment concede,

> "The purpose . . . is to create a new nonimmigrant visa classification that will strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking of aliens, and other crimes described in section 101(a)(15)(U)(iii) of the Immigration and Nationality Act committed against aliens, *while offering protection to victims of such offenses in keeping with the humanitarian interests of the United States*."

Mo. Dismiss at 2, *quoting* Pub. L. 106-386 at § 1513(a)(2)(A) (emphasis added). Of course, § 1101(a)(15)(U) cannot help crime victims if defendants refuse to implement it.

An administrative agency cannot be suffered to abdicate its responsibility to implement statutory standards under the guise of determining that inaction is the best method of implementation. *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 394 (1974). "Where a statute is enacted to benefit a designated class of persons by allowing relief in a particular situation, we will presume in the absence of substantial evidence to the contrary that Congress intended the statute to be implemented." *United States v. Markgraf*, 736 F.2d 1179, 1183 (7th Cir. 1983).[23]

Finally, it is obvious that plaintiffs' claims satisfy the fourth *Cort* factor: the claims for relief they assert here have never been delegated to state law and are, indeed, a matter of exclusive federal prerogative. *Nyquist v. Mauclet*, 432 U.S. 1, 10 (1977) ("Control over immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere").

As against this straightforward analysis defendants offer unexplained citations to *Suter v. Artist M.*, 503 U.S. 347 (1992), and *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831 (9th Cir. 2000). Motion to Dismiss at 13. Neither decision aids defendants.

---

[23] *See also*, *Myers v. United States*, 272 U.S. 52, (1926) (Holmes, J., dissenting) (cited with approval by Mr. Justice Frankfurter in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) ("The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.")).

In *Suter*, foster children sued to enforce a provision of the Adoption Assistance and Child Welfare Act of 1980 that conditioned federal reimbursement to state child welfare agencies on their having a plan under which they would make "reasonable efforts" to prevent removal of children from their homes. *Id*. at 350-51. The plaintiffs conceded that the state had such a plan, but sued under 42 U.S.C. § 1983 over alleged violations of specific provisions of the state's plan. *Id*. at 358-59. The Court noted that Congress had granted the Secretary of Health and Human Services specific authority to enforce state plans, and held that the "reasonable efforts" language "impose[d] only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary [of Health and Human Services]…" *Id*. at 360-63.

Here, in contrast, the Crime Victims Act does "not speak 'only in terms of institutional policy and practice,' but rather require[] that benefits be provided to particular persons ...." *Price v. City of Stockton*, 390 F.3d 1105, 1111 (9th Cir. 2005) (explaining and distinguishing *Suter*).[24]

In sum, defendants' theory that they may ignore Congress's enactment cannot withstand analysis.

IV     PLAINTIFFS HAVE STATED A VIABLE CLAIM FOR RELIEF CHALLENGING DEFENDANTS' FAILURE TO PROMULGATE REGULATIONS IMPLEMENTING THE U VISA PROGRAM.

    **A     This Court has jurisdiction to enjoin defendants' failure to promulgate U visa regulations.**

As they must, defendants concede that Congress unambiguously directed them to promulgate regulations implementing the U visa program by July 4, 2006. On January 5, 2006, the Violence Against Women and Department of Justice Reauthorization Act of 2005 (VAWA Reauthorization Act) was signed into law. The Act comes as a follow-up to the Crime Victims Act passed several

_____

[24] Defendants' reliance on *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang, supra,* is so far afield as scarcely to merit comment. In *Opera Plaza*, a homeowners' association sued homeowners under the federal Telecommunications Act of 1996 alleging violation of an association policy prohibiting installation of satellite dishes in common areas. The court held that the Telecommunications Act "does not confer jurisdiction on the federal courts to hear a routine suit by a condominium homeowners association to enforce its rules against the placement of a satellite television dish in common areas." *Id*. at 832.

years before, which created the U visa program. In view of defendants' persistent failure to promulgate regulations, Congress gave them one more chance, directing that "[n]ot later than 180 days after the date of enactment of this Act, the Attorney General, the Secretary of Homeland Security, and the Secretary of State *shall promulgate regulations* to implement the provisions contained in the Battered Immigrant Women Protection Act of 2000, this Act, and the amendments made by this Act." Pub. L. 109-162, 119 Stat. 2960 (2006) (emphasis supplied). That this Court has jurisdiction to enforce Congress's directive cannot be seriously questioned.

The Administrative Procedure Act (APA) authorizes suit by "'[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004) ("*SUWA*"), *citing* 5 U.S.C. § 702.[25]

The APA also explicitly authorizes the federal courts to remedy an agency's unlawful failure to act, providing that a "reviewing court shall…compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).[26]

An administrative agency may elect to implement a statutory benefit program by way of adjudication in lieu of rulemaking. *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). Here, however, two factors establish that defendants have no choice but to promulgate regulations implementing the U visa program.

First, in this case Congress directed defendants to promulgate U visa regulations, and defendants have no discretion to ignore that directive.[27]

---

[25] "Agency action" is defined in § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*." *Id.* at 62 (emphasis supplied).

[26] Under the APA, a failure to act is "the omission of an action without formally rejecting a request— for example, *the failure to promulgate a rule … by a statutory deadline*." *SUWA, supra*, 542 U.S. at 63 (emphasis added). Federal courts may enjoin an agency to act "where the agency fails to carry out a mandatory, nondiscretionary duty." *Id.* at 62.

1    Second, defendants themselves insist that they will not and cannot grant anyone a U visa until

2    regulations are issued. Mo. Dismiss at 18 ("Only once regulations are promulgated may USCIS begin

3    to adjudicate and issue U visas, …"). Therefore, it is clear that defendants will continue to deny

4    plaintiffs the benefits Congress has granted them for howsoever long they require to publish

5    regulations..

6    As an administrative agency charged with implementing a statutory benefit program,

7    however, defendants simply may not deny eligible applicants any way to apply for it.[28]

8    Nor does defendants' eleventh-hour promise to implement the U visa program at some

9    uncertain future date alter this analysis. It is axiomatic that government officials are under an

10    affirmative duty to take required action within a reasonable time.[29]

11

12

13

---

14    [27] *Cf. NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974) (indicating agency may not proceed by way of adjudication if doing so would violate statute); *Brock v. Pierce County*, 476 U.S. 253, 260 n.7 (1986) ("statutory command that the Secretary 'shall' act within 120 days does not commit such action to the Secretary's discretion.").

15

16    [28] *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 553 (9th Cir. 1990) (due process guarantees right to apply for political asylum); *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562 (11th Cir. 1989), *aff'd sub. nom. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) (due process guarantees right to apply for Special Agricultural Worker amnesty status); *Griffeth v. Detrich*, 603 F.2d 118, 120-122 (9th Cir. 1979) (due process right to apply for general relief); *see generally*, *Mallette v. County Employees' Retirement System II*, 91 F.3d 630, 638-39 (4th Cir. 1996) (rejecting argument that applicants have no due process right to apply for statutory benefits and collecting cases); *see also Rockbridge v. Lincoln*, 449 F.2d 567, 571 (9th Cir. 1971) ("There can be no question but that when Congress enacted § 261 it intended that the Commissioner would 'specify(ing) the kind and quantity of goods and the price at which such goods shall be sold to the Indians' … (The Commissioner does not have) unbridled discretion to refuse to regulate ….."); *Abrams v. Hills*, 547 F.2d 1062 (9th Cir. 1976), *cert. dismissed*, 439 U.S. 1001 (1978) (Congress did not intend to give the Secretary of Housing and Urban Development the discretion to decline to spend any of the money targeted for the operating subsidy program).

25    [29] *See* 5 U.S.C. § 555(b) (agency required to conclude a matter presented to it "within a reasonable time"); *Fraga v. Smith*, 607 F. Supp. 517, 521 (D. Or. 1985); *Hsieh v. Kiley*, 569 F.2d 1179, 1182 (2d Cir.), *cert. denied*, 439 U.S. 828 (1978) (visa application); *Paunescu v. INS*, 76 F. Supp.2d 896, 901 (N.D. Ill. 1999) (immigrant visa and adjustment of status); *Yu v. Brown*, 36 F. Supp.2d 922, 931 (D.N.M. 1999) (adjustment of status).

Under 5 U.S.C. § 706(1), courts may compel "agency action unlawfully withheld or unreasonably delayed." Courts apply a six-factor test under § 706:

(1) the time agencies take to make decisions must be governed by a "rule of reason";

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for the rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (citations omitted). Applying the six-part *Telecommunications Research & Action Center* test to the facts at bar readily demonstrates that plaintiffs' have stated a viable claim for relief.

First, defendants' delaying the promulgation of regulations implementing the U visa program for seven years *without explanation* is the antithesis of the rule of reason.

Second, the VAWA Reauthorization Act contains an express timetable for the promulgation of U visa regulations.

Third, defendants' delays directly impact a vulnerable population's health and welfare and have nothing to do with economic regulation.

Fourth, plaintiffs can imagine no group of applicants for immigration benefits—and defendants have pointed to none—whose applications are deserving of higher priority.

Fifth, what has already been said concerning the urgency of bringing this population out of the undocumented underground is of obvious relevance to "the nature and extent of the interests prejudiced by delay."

1   Sixth, although the Court need discern no impropriety behind defendants' delaying the

2   promulgation of U visa regulations, their unexplained delay of nearly seven years is certainly not

3   indicative of an agency greatly concerned for crime victims.

4   In sum, when the apposite legal test is applied to plaintiffs' first claim for relief, it is plain that

5   a viable claim for relief has been stated, and courts have so held in circumstances indistinguishable

6   from those at bar.

7   The Ninth Circuit, for example, found unreasonable delay and enforced a congressional

8   deadline analogous to that of the instant case in *Biodiversity Legal Foundation v. Badgley*, 309 F.3d

9   1166, 1178 (9th Cir. 2002). There, environmental groups sued federal agencies for failing to meet

10   statutory deadlines for listing endangered species. *Id*. at 1170. The Government interpreted the statute

11   as fixing a deadline only "to the maximum extent practicable." Where no deadline is practicable, it

12   maintained, it could delay listing a species as endangered indefinitely. *Id*. at 1175. The court

13   disagreed.

14   The court rejected the defendants' demand that it defer to its construction of the statute as

15   imposing no effective deadline.[30] Just like the disputed Act in *Badgley*, the obvious intended result

16   of the VAWA Reauthorization Act was to end defendants' delay in issuing U visa regulations. And,

17   just like the concern expressed for the endangered species in *Badgley*, defendants' failure to

18   promulgate U visa regulations in defiance of Congress's directive is clearly actionable.[31]

19

20   ─────────────────

21   [30] The court held that that although deference will generally be given "to an agency's construction of

22   a statutory provision it is charged with administering," no deference is given to "those constructions

23   that are contrary to clear congressional intent or that frustrate the policy Congress sought to

implement." *Id*. at 1175. The court pointed out that the defendants' interpretation the statutory

deadline provision would reduce it to a nullity. *Id*.

24   [31] *San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 885 (9th Cir. 2002), Mo. Dismiss at 14, is

25   not to the contrary. There, the plaintiff sought "a declaration that the state of California failed to

implement an adequate water pollution control program" and to submit adequate reports. *Id*. at 877.

26   The plaintiffs argued that the apposite statute required the simultaneous submission of two separate

water quality reports. *Id*. at 884. The defendants countered that the statute required both reports, but

27   not that they be filed simultaneously. *Id*. at 885. In finding that the statute imposed no requirement to

Defendants insist that they are free to flaunt Congress's directive because it did not prescribe specific consequences for their failing to promulgate the regulations within 180 days. Defendants rely on *Brock v. Pierce County*, 476 U.S. 254 (1986), and *Gottlieb v. Pena*, 41 F.3d 730 (D.C. Cir. 1974), for this remarkable proposition. Mo. Dismiss at 14. Neither decision aids defendants.

In *Brock,* the Court rejected an argument that the Secretary of Labor loses all authority to collect misused funds when he or she makes a final decision to recover those funds after a statutory deadline. 476 U.S. at 254. The Court observed that the appropriate remedy for one aggrieved by the Secretary's delay would be to sue under the APA to compel the Secretary to act, precisely as plaintiffs do here. *Id*. at 260.[32]

Defendants in the instant case have a clear statutory duty to act and have unreasonably delayed complying with Congress's directives. Defendants' motion to dismiss should accordingly be rejected.

**B        Defendants' refusal to promulgate U visa regulations is final action within the meaning of the Administrative Procedure Act.**

Descending into the Kafkaesque, defendants next argue that their failure to implement the U visa program is not "final agency action" that this Court may set aside pursuant to 5 U.S.C. § 706(2)(a) as "arbitrary and capricious."

---

file the reports simultaneously, the court reaffirmed the rule that a claim of unreasonable delay must be based on a statutory duty.

[32] Defendants illogically conflate the remedy sought in the present action—a requirement that they promulgate regulations—with a *divestment* of authority to promulgate the regulations. All the cases they rely on hold only that in order for an agency to be divested of authority to act, such a consequence must be specified by statute. *See United States v. Montalvo-Murillo*, 495 U.S. 711, 713 (1990) (failure to hold a timely detention hearing for a suspect in pretrial custody does not strip government of all power to act or require detainee's release); *Gottlieb v. Pena*, 41 F. 3d 730, 733-34 (D.C. Cir. 1994) ("[M]issing a statutory deadline does not divest an agency of authority over a case or issue. Instead, in general the proper recourse for a party aggrieved by delay that violates a statutory deadline is to apply for a court order compelling agency action."); *Liesang v. Secretary of Veterans Affairs*, 312 F.3d 1368, 1377 (D.C. Cir. 2002) (same)..

Clearly an administrative agency cannot evade judicial review forever by continually postponing any consequence-laden action and then challenging federal jurisdiction on "final agency action" grounds.[33]

"At some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review." *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C. Cir. 1970); *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 594-595 (D.C. Cir. 1971) (same).

But perhaps the best answer to defendants is also the shortest: regardless of what § 706(2)(a) may require insofar as finality is concerned, 5 U.S.C. § 706(1) authorizes the Court to compel "agency action unlawfully withheld or unreasonably delayed." There is scant need to belabor the matter further.

> **C      Regardless of whether or not they promulgate U visa regulations, defendants may not lawfully refuse crime victims the full measure of the immigration-related rights and benefits Congress has conferred on them.**

Defendants direct their substantive arguments principally against plaintiffs' First Cause of Action: *i.e.*, that defendants' have unlawfully failed to promulgate regulations implementing the U visa program.

Yet the fundamental interest plaintiffs seek to vindicate here is their right to *receive the immigration benefit* Congress created for them. Thus, plaintiffs' Second Cause of Action seeks redress for defendants' refusal to receive and adjudicate U visa applications *regardless of whether they promulgate regulations*. In short, defendants must *either* promulgate regulations implementing

---

[33] *See, e.g., Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("As this court has noted in the past, where an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review. Were it otherwise, agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action.") (citations and internal punctuation omitted); *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) (deeming an agency's withholding of action unreviewable would permit the agency to "forever evade our review").

the U visa program or receive and adjudicate proposed class members' U visa applications directly under the apposite statutes.

In *Zaharakis v. Heckler*, 744 F.2d 711 (9th Cir. 1984), disability claimant sued to enjoin the Secretary of Health and Human Service's use of a particular accounting method in determining his monthly disability benefits because the accounting method had not been promulgated as a regulation in accordance with the Administrative Procedure Act. *Id.* at 714. The court disagreed, holding that the accounting method was prescribed by statute and that regulations implementing the method were unnecessary:

> Just as regulations cannot be promulgated in disregard of statutory commands, *United States v. Larionoff*, 431 U.S. 864, 873 (1977); *Pacific Gas & Electric Co. v. United States*, 664 F.2d 1133, 1136 (9th Cir. 1981), an agency's failure to act cannot undermine or supersede explicit congressional requirements. Here, Congress has mandated by statute a particular accounting system whose legality is not contingent on the promulgation of implementing regulations. Congress mandated the use of retrospective monthly accounting in 42 U.S.C. § 1382(c)(1) and, as the district court concluded, such a mandate is self-executing.

*Id.* at 713 (emphasis supplied).

Here, too, the U visa provisions of the Crime Victims Act are explicit congressional requirements with independent force. Therefore, even assuming, *arguendo*, that plaintiffs' challenge to defendants' failure to publish regulations were not cognizable, the U visa provisions of the Crime Victims Act would still place defendants under an unambiguous legal duty to confer U visas on eligible applicants regardless.

V      DEFENDANTS' UNILATERALLY REDUCING THE RIGHTS OF DEFERRED ACTION APPLICANTS TO EMPLOYMENT AUTHORIZATION VIOLATES THE APA'S NOTICE AND COMMENT REQUIREMENTS.

For years defendants permitted crime victims to apply for and receive work authorization simultaneously with deferred action. Complaint ¶¶ 43-44. In November 2006, however, defendants embarked upon a new policy to reject applications for work authorization until after deferred action is granted. *Id.* Because defendants take several months to decide a request for work authorization, their new policy and practice accordingly delay the time when crime victims may work lawfully in the United States.

1    In their Fifth Claim for Relief plaintiffs challenge defendants' failure to comply with the

2  APA's notice and comment requirements before reducing the rights of deferred action applicants to

3  employment authorization.[34] Defendants argue this change is an "interpretive rule" exempt from the

4  notice and comment requirements. Motion to Dismiss at 19. Plaintiffs disagree.

5    The APA provides that "a person may not in any manner be required to resort to, *or be*

6  *adversely affected by*, a matter required to be published in the Federal Register and not so published."

7  5 U.S.C. § 552(a) (emphasis supplied).

8    5 U.S.C. § 552(a)(1)(D) and (E) require administrative agencies to publish in the Federal

9  Register "substantive rules of general applicability adopted as authorized by law, and statements of

10  general policy or interpretations of general applicability formulated and adopted by the agency; and

11  each amendment, revision, or repeal of the foregoing." Sections 553(b) and (c) require agencies to

12  publish proposed rules in the Federal Register and provide the public 30 days within which to

13  comment on the proposed rules.

14    Section 553(b)(3)(A) exempts "interpretative rules, general statements of policy, or rules of

15  agency organization, procedure, or practice" from the foregoing notice and comment procedures.

16  These exemptions to the APA's notice and comment requirements are "narrowly construed and only

17  reluctantly countenanced." *American Fed. Gov't Employees v. Block*, 655 F.2d 1153 (D.C. Cir.

18  1981).

19    The distinction between an interpretive rule and a substantive one is a hazy continuum. *See*

20  *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 909 (D.C. Cir. 1983) (noting "fuzzy

21  perimeters" of interpretive rule exemption). Courts have sought to distinguish cases in which an

22

23  _____

24  34  Although not expressly alleged in the Complaint, defendants' failure to issue work authorization
simultaneously with deferred action also violates 8 U.S.C. § 1184(p)(3)(B), which provides: [T]he

25  Attorney General shall, *during the period those aliens are in lawful temporary resident status* under
[8 U.S.C. §§ 1101(a)(15)(U)], provide the aliens with employment authorization." (Emphasis added.)

26

27  The statute thus requires defendants to issue crime victims employment authorization immediately
because they are in lawful temporary status the moment they receive U visas.

28

agency is merely explicating Congress's desires from those in which the agency is adding substantive content of its own. Substantive rules are ones which "grant rights, impose obligations, or produce other significant effects on private interests," *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir. 1980) (citations omitted), or which "effect a change in existing … policy." *Alcaraz v. Block*, 746 F.2d 593, 613 (D.C. Cir. 1984) (*quoting Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983)). Interpretive rules, in contrast, "are those which merely clarify or explain existing law or regulations," *Alcaraz, supra,* at 613, are "essentially hortatory and instructional." *Id*.

Congress clearly desired that crime victims have work authorization during the entire period they enjoy lawful U visa status. Defendants' deviating from that norm hardly "explicates" Congress desires, but rather creates a substantive limitation on an important right—the right to work—that produces "significant effects" on class members' interests.

Defendants suggest that they need not comply with the notice and comment requirements because they can provide a "reasoned analysis indicating that their prior policies and standards are being deliberately changed, not casually ignored." Motion to Dismiss at 19, *quoting Atchison v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973). The notion borders on the frivolous. *Atchison* did not involve the APA's notice and comment requirements at all, but rather considered whether administrative agencies may act arbitrarily in changing their rules.

Defendants concede that they for a time adjudicated applications for deferred action concurrently with applications for work authorization. Mo. Dismiss at 20. However, at some point the volume of applications for U visas allegedly increased to the point where defendants found it difficult to adjudicate them within the 90 days their regulations allow to adjudicate *applications for work authorization*. *Id*. at 20.[35] Defendants' response was to evade a technical violation of the 90-day

---

[35] Defendants offer evidentiary material in support of this explanation, which is, of course, improper on a motion to dismiss and should be excluded. If the Court does admit defendants' evidence, it should afford plaintiffs notice and an opportunity to conduct discovery. *Cf.* Rule 12(b), Fed. R.Civ.Proc. ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and

regulatory deadline for adjudicating work authorization applications—a regulation designed to *limit* delay—by refusing to receive such applications until after they'd managed to adjudicate the applicant's application for deferred action. In essence, defendants *increased* the delay crime victims experience in obtaining work authorization in order to "comply" with a regulation designed to *reduce* delay.

Defendants' contending that this was a "well-reasoned" course of action borders on the absurd. Their motion to dismiss should be denied.

VI    DENYING THE PARENTS OF U.S. CITIZEN CRIME VICTIMS THE IMMIGRATION BENEFITS
      ENJOYED BY THE PARENTS OF ALIEN CRIME VICTIMS IS NEITHER RATIONAL NOR
      SUBSTANTIALLY RELATED TO AN IMPORTANT GOVERNMENTAL INTEREST.

Plaintiffs' Ninth Claim for Relief challenges the Crime Victims Act's discriminating against crime victims who are United States citizens under the age of 16. Under §§ 1101(a)(15)(U)(i)(III) and 1184(p) the immigrant parents of United States citizen crime victims are ineligible for U visas, whereas the identically situated parents of alien crime victims are eligible for such visas. In essence, the statutory scheme discriminates *against* young U.S. citizen children, allowing alien children under the age of 16 the support and comfort of their parents while forcing identically situated U.S. citizen children to chose between separation from their parents, *de facto* deportation, or a life of poverty and deprivation as dependents of parents consigned to the undocumented underground. This unequal treatment is irrational and violates the equal protection guarantee of the Fifth Amendment to the United States Constitution.

A    **The challenged classification scheme burdens innocent children's right to family
      integrity, and must therefore be substantially related to an important
      governmental interest.**

The command of equal protection is that similarly situated individuals must be accorded

---

not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."); *Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 646 (9th Cir. 1981) ("[D]efending party's opportunity to discovery should not be foreclosed by order of the court before the moving party has presented critical factual materials on which he intends to rely and against which a defense is to be mounted.").

similar protections unless some legitimate purpose is served by disparate treatment. *Stanton v. Stanton*, 421 U.S. 7, 14 (1975). The constitutional imperative is not that government treat all persons equally, for "[t]he Constitution does not require things which are different in fact ... to be treated as though they were the same." *Tigner v. State of Texas*, 310 U.S. 141, 147(1939). But the equal protection guarantee does ensure that distinctions drawn between two groups have "some relevance to the purpose for which the classification is made." *Baxtrom v. Herold*, 383 U.S. 107, 111 (1965).

The test applied in determining the constitutionality of a classification turns on the nature of the classification and on the importance of the individual liberty impaired thereby. In most cases the reviewing court applies a "rational basis" test. Under this test a classification is valid if it bears a reasonable relation to a legitimate governmental interest. *Plyler v. Doe*, 457 U.S. 202, 216-217 (1982).[36]

An intermediate level of review, falling between the rigorous strict scrutiny test and the rational basis test is applied to a certain classifications, including those based on gender and illegitimacy and to classifications burdening "important" constitutional rights. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). To pass muster under this intermediate test, a classification must bear a "substantial relationship" to an "important" governmental interest. *Id.*

From the standpoint of a citizen crime victim whose parent happens to be an undocumented alien, it is clear that the classification created under the U visa statute targets innocent children and burdens their right to family integrity. Under such circumstances, intermediate scrutiny should be applied.

First, imposing disabilities on innocent children is "contrary to the basic concept of our system that burdens should bear some relationship to individual responsibility or wrongdoing." *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175 (1972).

Second, the Court has frequently emphasized the constitutional importance of the right to

---

[36] "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

family integrity.[37]

When solicitude for innocent children is combined with constitutional protection afforded children's right to family integrity, the governmental interest here should be important and the challenged classification substantially related to furthering that interest.

In *Plyler*, *supra*, the Court held that intermediate scrutiny should be applied when a law discriminates against children on the basis of their immigration status and burdens their interest in a public education. 457 U.S. at 221. Though not a fundamental right, the Court found education sufficiently important to warrant intermediate scrutiny where the classification singled out children for a status—being undocumented immigrants—over which they had no control. *Id.* at 221-224.[38]

Plaintiffs' case for intermediate scrutiny is even stronger. Absurdly, U.S. citizen children here are burdened because they are U.S. citizens, a status they acquired at birth and for which they bear no responsibility. Denying them the support of their parents unquestionably burdens an important constitutional interest, and the government's interest should be important and the means selected substantially related to furthering that goal.

---

[37] The rights to conceive and to raise one's children have been deemed "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), "basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541, 535 (1942), and "rights far more precious . . . than property rights," *May v. Anderson*, 345 U.S. 528, 533 (1953). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra*, at 399, the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma, supra*, at 541, and the Ninth Amendment, *Griswold v. Connecticut*, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring).

[38] In *Clark v. Jeter*, *supra*, 486 U.S. 456, the petitioner sued on her daughter's behalf for child support ten years after her illegitimate birth. The trial court entered judgment against the petitioner on the grounds that the statute of limitations had run because she did not file suit within six years of the child's birth. The state courts rejected the petitioner's claim that the statute of limitations denied her daughter equal protection of the laws. The Supreme Court held that intermediate scrutiny must be applied in "evaluating equal protection challenges to statutes of limitations that apply to suits to establish paternity, and *thereby limit the ability of illegitimate children to obtain support*." 486 U.S. at 461-62 (emphasis supplied).

1    According to defendants, the interest underlying this classification is to limit U visas to

2    circumstances in which they are "necessary to meet the goal of encouraging reporting and

3    participation in prosecution." Mo. Dismiss at 22. Defendants suggest that the parents of U.S. citizens

4    already enjoy so many opportunities to attain lawful status that excluding them from the U visa

5    program furthers the government's interest. Mo. Dismiss at 22.

6    First, the governmental interest defendants see in excluding the parents of U.S. citizen crime

7    victims from the U visa program—limiting such visas to persons who have no other *potential* path to

8    lawful status—cannot be squared with the U visa statute itself, which provides: "Nothing in this

9    subsection limits the ability of aliens who qualify for status under section 101(a)(15(U) [8 U.S.C. §

10   1101(a)(15(U)] to seek any other immigration benefit or status for which the alien may be eligible." 8

11   U.S.C. § 1184(p)(5).

12   Second, the two "alternative" immigration benefits defendants identify as being available to

13   the undocumented parents of U.S. citizens and not aliens—(i) the right of U.S. citizens over 21 years

14   old to obtain immigrant visas for their parents, 8 U.S.C. § 1151(b)(2)(A)(i); and (ii) the immigration

15   benefit known as cancellation of removal, 8 U.S.C. 1229b, Mo. Dismiss at 22—are clearly not

16   substitutes for the U visa.

17   First, it is plain that  § 1151(b)(2)(A)(i) and the U visa statute target the parents of two wholly

18   distinct groups: § 1151(b)(2)(A)(i) benefits the parents of U.S. citizens over 21, whereas the U visa

19   statute, shorn of its challenged classification, would benefit the parents of those under 21. Thus, a U

20   visa is hardly be an "extra" immigration benefit for the parents of young U.S. citizen crime victims:

21   Such persons are ineligible for the immigrant visas defendants rely upon as an "alternative" remedy.

22   Second, cancellation of removal is not an affirmative immigration benefit at all, but rather a

23   defense to deportation. Thus, there is no right to apply for cancellation unless the individual is placed

24   in removal proceedings. *See* 8 C.F.R. §§ 240.20 *et seq*. Thus, cancellation does nothing to alleviate

the hardships of U.S. citizen children whose parents remain in the undocumented underground.[39]

In sum, (i) Congress itself chose not to limit U visas to persons without any other means to legalize; (ii) no parent who is eligible to immigrate through § 1151(b)(2)(A)(i) would also be eligible for a U visa were the statute to grant such visas to those who have U.S. citizen children; and (iii) while a small minority of parents *might* be eligible for both cancellation of removal and U visas but for the challenged classification, the same could be said of the parents of at least some alien children.

It is also plain that extending eligibility to the parents of citizen crime victims would further the express governmental interest underlying the U visa program. Merely having a young U.S. citizen child generally yields no immigration benefits to an undocumented parent. Thus, the undocumented parent of a citizen child crime victim and the undocumented parent of an immigrant child crime victim would experience the identical reluctance to report that crime and to cooperate with law enforcement. For all practical purposes, then, the classification plaintiffs' challenge here does nothing to further the government's purported interest in limiting U visas to circumstances where they would encourage cooperation with law enforcement.

**B     The challenged classification is also devoid of a rational basis.**

Even assuming, *arguendo*, that the rational basis test applies to this case, that test "is not a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), satisfied by dubious justifications the record shows implausible in fact.[40]

_____

[39] Those parents who are placed in removal proceedings may obtain cancellation only upon a showing that they have been physically present in the United States for a continuous period of not less than 10 years and that their removal would result in "exceptional and extremely unusual hardship to the alien's … child, who is  citizen of the United states or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b). Therefore, not only is it exceedingly difficult to win cancellation of removal, the eligibility requirements for cancellation bear no resemblance to those of the U visa statute. Further undercutting defendants' position is that *cancellation it is a benefit available not only to the parents of U.S. citizens, but of alien children as well*.

[40] *E.g., Jimenez v. Weinberger*, 417 U.S. 628 (1974) (no evidence showing removal of classification among illegitimates "would significantly impair the federal Social Security trust fund and necessitate a reduction in the scope of persons benefited by the Act"); *U.S. Dept. of Agriculture v. Moreno*, 413

1

2          The federal courts have applied the rational basis test to strike down distinctions between

3    similarly situated classes of immigrants, whether such classifications were created by statute or INS

4    policy. *See, e.g.*, *Francis v. INS*, 532 F.2d 268, 272-73 (2d Cir. 1976) (court applied the rational basis

5    test to strike a statutory distinction between two classes of aliens because "the distinction between

6    these two classes of aliens lacks any basis rationally related to a legitimate governmental interest, and

7    therefore, deprives [plaintiff] of the equal protection of the law"*); Garberding v. INS,* 30 F.3d 1187,

8    1190-91 (9th Cir. 1994) (irrational to deport an immigrant because she did not qualify under state law

9    for expungement of a conviction, even though she met all criteria for expungement under the Federal

10   First Offender Act); *Tapia-Acuna v. INS*, 640 F.2d 223, 224-25 (9th Cir. 1981) (equal protection

     analysis of immigrant classification); *Butros v. INS*, 990 F.2d 1142 (9th Cir. 1993) (same).

11         What has been argued *ante* regarding the disjuncture between the declared purpose underlying

12   the U visa benefit and denying the parents of U.S. citizen crime victims such visas applies as well

13   should the Court review the challenged classification for a rational basis only. Regardless of the

14   appropriate level of scrutiny, defendants' motion should be denied.

15   VII    PLAINTIFFS HAVE A COGNIZABLE DUE PROCESS INTEREST IN APPLYING FOR AND RECEIVING
            AN ADJUDICATION OF THEIR ELIGIBILITY FOR U VISAS.
16

17         Plaintiff crime victims plainly have an interest in obtaining U visas and related benefits that is

18   protected under the Due Process Clause of the Fifth Amendment. *See, e.g.*, *Orantes-Hernandez v.*

19   *Thornburgh*, 919 F.2d 549, 553 (9th Cir. 1990) (due process guarantees right to apply for political

20   asylum); *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562 (11th Cir. 1989), *aff'd sub. nom.*

21   *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) (due process guarantees right to apply for

22   Special Agricultural Worker amnesty status); *Griffeth v. Detrich*, 603 F.2d 118, 120-122 (9th Cir.

23   1979) (due process right to apply for general relief); *see generally*, *Mallette v. County Employees'*

24

25   U.S. 528 (1973) (striking down classification excluding from food stamp program any household
     containing an individual who is unrelated to any other member of the household where "clearly
26   irrelevant to the stated purposes of the Act"). The mere explication of a justification in the face of
     contrary evidence does not satisfy the rational-basis test. *E.g.*, *City of Cleburne v. Cleburne Living*
27   *Center*, 473 U.S. 432, 449-50 (1985).

     OPPOSITION TO MOTION TO DISMISS                                    CENTER FOR HUMAN RIGHTS
28   CASE NO. C 07-01307-PJH                    - 33 -                  256 S. Occidental Blvd LA 90057

1   *Retirement System II*, 91 F.3d 630, 638-39 (4th Cir. 1996) (due process right to apply for statutory

2   benefits and collecting cases). Defendants' assertion to the contrary should be rejected and their

3   motion to dismiss denied.

4   VIII   CONCLUSION

5         For the forgoing reasons, defendants' motion to dismiss should be denied.

6   Dated:  July 18, 2007.                          CENTER FOR HUMAN RIGHTS AND
                                                     CONSTITUTIONAL LAW
7                                                    Peter A. Schey
                                                     Carlos Holguín
8                                                    Cynthia Lucas

9

10

11                                         _____s/_____
                                                   Peter A. Schey
12

13

14                                         _____s/_____
                                                   Carlos Holguín
15                                                 *Attorneys for Plaintiffs*

16   / / /

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE

I, Peter Schey, declare and say as follows:

1. I am over the age of eighteen years and am not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 256 S. Occidental Blvd., Los Angeles, California, 90057, in said county and state.

2. On July 18, 2007, I caused to be served a true and correct copy of the attached OPPOSITION TO MOTION TO DISMISS on defendants by email addressed to Ila Casy Deiss  ila.deiss@usdoj.gov, Tiffani Chiu  tiffani.chiu@usdoj.gov  Victor M. Lawrence   victor.lawrence@usdoj.gov  Jeffrey S. Robins  jeffrey.robins@usdoj.gov and by messenger for overnight delivery to:

> Victor Lawrence
> Office of Immigration Litigation
> Department of Justice
> Suite 7025S, National Place
> 1331 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 18th day of July 2007, in Los Angeles, California.

_____s/_____
Peter Schey

/ / /